JOINER, Judge.
James Donald Yeomans, an inmate on death row at Holman Correctional Facility, *1023 appeals the Geneva Circuit Court’s dismissal of his petition for postconviction relief under Rule 32, Ala. R.Crim. P. We affirm in part and remand with instructions.

Facts and Procedural History ■

In 2001, Yeomans was convicted-of four counts of capital murder for killing his wife, Julie Ann Yeomans, and her parents, Jake and Sylvia Simmons; specifically, Yeomans was convicted of three counts of capital murder under § 13A-5-40(a)(10), Ala.Code 1975 (murder of. two or more persons pursuant to one scheme or course of conduct), and one count of capital murder under § 13Á — 5-40(a)(2), Ala.Code 1975 (murder during the course of a first-degree robbery).[1] The jury, by a vote of 11 to 1, recommended that Yeomans be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Yeomans to death.
On appeal, this Court remanded the case for the circuit court to “strike two of Yeo-mans’s convictions and sentences for the murder of two or more persons pursuant to one scheme or course of conduct,” thereby leaving one conviction and sentence for the murder of two or more persons pursuant to one scheme or course of conduct as well as Yeomans’s conviction and sentence for robbery-murder. Yeomans v. State, 898 So.2d 878, 906 (Ala.Crim.App.2004). This Court also directed the circuit court on remand to amend and clarify its sentencing order to comply with § 13A-5-47(d), Ala.Code 1975.[2] On return to remand, this Court affirmed Yeomans’s convictions and sentence's, in’ an' unpublished memorandum, on June 25, 2004. The Alabama Supreme Court denied cer-tiorari review on February 25, 2005, Ex parte Yeomans (No. 1040266), and this Court issued its certificate of judgment, making Yeomans’s direct appeal final, on February 28,-2005. '
On February 27, 2006, Yeomans filed a petition for postconviction relief under Rule 32, Ala. R.Crim. P. (C., 35.) The State filed an answer to the petition on June 13, 2006, and a motion to dismiss on December 29, 2006. (C. 176, 233.) On May 17, 2007, Yeomans filed both a response to the State’s answer and motion to -dismiss and an amended petition.- (C. 284.) The State, on April 1, 2010, moved to dismiss the amended petition. (C. 540.) Yeomans filed a response in opposition to the State’s • motion to dismiss. (C. 604!) The circuit court, in a written order, summarily dismissed the petition on August *1024 25, 2010. (C. 697.) Yeomans appealed to this Court. See Rule 32.10, Ala. R.Crim. P.

Standard of Review

Yeomans appeals the circuit court’s summary dismissal of his petition for postcon-viction relief filed pursuant to Rule 32, Ala. R.Crim. P. Yeomans has the burden of pleading and proving his claims.[3] Rule 32.3, Ala. R.Crim. P., provides:
“The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.”
“The standard of review this Court uses in evaluating the rulings made by the trial court [in a postconviction proceeding] is whether the trial court abused its discretion.” Hunt v. State, 940 So.2d 1041, 1049 (Ala.Crim.App.2005). However, “when the facts are undisputed and an appellate court is presented with pure questions of law, [our] review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). “[W]e may affirm a circuit court’s ruling on a postconviction petition if it is correct for any reason.”[4] Smith v. State, 122 So.3d 224, 227 (Ala.Crim.App.2011).
The circuit court summarily dismissed all but one[5] of Yeomans’s claims based on defects in the pleadings and the application of the procedural bars in Rule 32.2, Ala. R.Crim. P. When discussing the pleading requirements for postconviction petitions, we have stated:
“The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003).”
Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006).
“ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’ Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion ‘which, if true, entitle[s] the petitioner to relief.’ Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to *1025 relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged fads.”
Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App.2003). “[T]he procedural bars of Rule 32[.2, Ala. R.Crim. P.,] apply with equal force to all cases, including those in which the death, penalty has been imposed.” Burgess v. State, 962 So.2d 272, 277 (Ala.Crim.App.2005).
In discussing the application of Rule 32.7(d), Ala. R.Crim. P., to summarily dismiss a claim, we have stated:
“[A] circuit court may, in some circumstances, summarily dismiss a postconviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R.Crim. P., provides:
“‘If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set- a ■ date for hearing.’
“ ‘ “Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.” ’ Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992) (emphasis added) (quoting Bishop v. State, 592 So.2d 664, 667 (Ala.Crim.App.1991) (Bowen, J., dissenting)). See also Hodges v. State, 147 So.3d 916, 946 (Ala.Crim.App.2007) (a postconviction claim is ‘due to be summarily dismissed [when] it is meritless on its face’)[, rev’d on other grounds, 147 So.3d 973 (Ala.2011) ].”
Bryant v. State, 181 So.3d 1087, 1102 (Ala.Crim.App.2011).
Finally, “[although on direct appeal we reviewed [Yeomans’s] capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate court is reviewing the denial of a postconviction petition attacking-a death sentence.” James v. State, 61 So.3d 357, 362 (Ala.Crim.App.2010) (citing Ex parte Dobyne, 805 So.2d 763 (Ala.2001)).

Discussion

I.
Yeomans argues that his trial counsel and appellate counsel were ineffective. To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel’s performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the. conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls *1026 within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689.
“[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately,’). We recognize that ‘[Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case,.means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something mpre or something, different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir.2000) (footnotes omitted).
An appellant is not entitled to “perfect representation.” Denton v. State, 945 S.W.2d 793, 796 (Tenn.Crim.App.1996). “[I]n considering claims of ineffective assistance of counsel, ‘we address not what is prudent or appropriate, but only what is constitutionally compelled.’” Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).
Yeomans raises several different allegations in support of his ineffective-assistance-of-counsel claims.
A.

Guiltr-Phase Ineffective-Assistance Claims

1.
Yeomans alleges that his “[c]ounsel was ineffective for failing to procure the assistance of experts necessary to effectively challenge the State’s case” during the guilt phase, (Yeomans’s brief, p. 39.) Specifically, Yeomans asserts that counsel failed to “procure an investigator or social worker, a mental health expert, or an intelligence or mental retardation expert.” (Yeomans’s brief, p. 39.) The circuit court, in summarily dismissing this claim, stated: “The Court finds the claim that counsel was ineffective for failure to hire investigative or mental health experts or social worker is without merit and refuted by the record in the case.” (C, 699.) The record supports the circuit court’s finding that this claim is “refuted is by the record.” See Rule 32.7(d), Ala. R.Crim. P. Moreover, .this claim is insufficiently pleaded. See Rule 32.3 and 32.6(b), Ala. R.Crim. P.
Addressing this claim more specifically, we note that, although not referenced by Yeomans in his amended petition or in his arguments to this Court, the record from his trial proceedings indicates that counsel requested, and the trial court approved, funds for “an investigator.” (Trial C; 83.) Further, the trial court approved trial counsel’s request for “a psychiatrist and/or psychologist to be chosen by the defense.” . (Trial C. 81.) Moreover, Yeomans has not *1027 asserted any facts suggesting' how the findings or performance of an additional expert would have differed from those the record indicates, the trial court authorized his trial counsel to use.

Investigator/Social Worker Claim

Yeomans, in paragraph 42 of his petition (C. 313), asserted that counsel was ineffective for failing to hire an investigator or social worker. As indicated above, Yeo-mans’s trial counsel- sought and received approval for funds to hire “an investigator.” Specifically, the trial court approved funds for up to 100 hours of work by an investigator. (Trial C. 83.)
Yeomans contends on appeal that “experts could have conducted ‘in-depth interviews’ with his adult son, Alan, who was present during the killings” and' that “[s]uch interviews' may - have led to the ‘discover[y] of critical evidence that could have negated the capital robbery charge’ or ‘uncovered exculpatory evidence.’ ” (Yeomans’s brief, p. 41 (quoting C. 313— 14).) The only specific allegation of “critical evidence” Yeomans' alleges an investigative expert could have discovered is that “the so-called stolen ‘purse’ underlying the robbery charge was actually a diaper bag owned by Yeomans.” (Yeomans’s reply brief, p. 26.)
In Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003), this Court, addressing insufficiently pleaded claims alleging ineffective assistance of counsel, stated:
“Boyd’s claim does not provide a ‘clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.’ ' Rule 32.6(b), Ala. R.Crim. P. (Emphasis added.)' With regard to this claim, no tangible fact tending to establish counsel’s allegedly inadequate performance was presented to the. circuit court. As the circuit correctly found, Boyd’s petition does not disclose the ‘critical exculpatory evidence’ that should have been uncovered •by his counsel; does not disclose ‘one specific piece of evidence that went undiscovered’ based on the allegedly deficient performance of counsel; does not disclose any reasons why-Boyd’s arrest and pretrial detention were unlawful; does not disclose how counsel allegedly failed to' adequately cross-examine witnesses or the information that was omitted as a result of the allegedly inade’quate cross-examination;’ and does not disclose what type 'of defense that counsel should have investigated or should have mounted. Thus, the circuit court correctly ruled that the claim had not been sufficiently pleaded.

U

“... Boyd [also] alleged that his trial counsel rendered ineffective assistance by ‘failing] to procure necessary expert assistance.’ . (C. 398.) ■ Boyd’s entire claim in this regard was asserted as follows:
“ ‘22. A criminal defendant’s right to benefit of expert assistance is eonsti-tutionally recognized and protected. Ake v. Oklahoma, 470 U.S. 68 (1985); Griffin v. Illinois, 351 U.S. 12 (1956); Gayle v. State, 591 So.2d 153 (Ala.Crim.App.1991). Trial counsel in [Boyd’s] case failed to procure an expert to counter the testimony presented by the State regarding the victim’s death. Had it not been for this error on the part of trial counsel, the result of the guilt phase of [Boyd’s] trial would have been different.’
“(C. 398.)
“With regard to this claim, the circuit court found, in pertinent part, as follows:
*1028 “‘Boyd does not state what type of expert should have been obtained, and in what way such an expert would have countered the State’s expert testimony.
[[Image here]]
. Boyd’s allegation is insufficient to warrant any further proceedings. See Williams v. State, 783 So.2d [108,] at 129-130 [ (Ala.Crim.App.2000) ] (“His entire argument in his petition consisted of the following statement: ‘Trial counsel failed to use the services of a forensic expert. Therefore, the defendant did not have the benefit of a skilled forensic investigator who could analyze the forensic evidence presented by the state.’ ... [T]he circuit court properly found that the appellant had not satisfied the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. (C.R.673.) In addition, the appellant did not satisfy the pleading requirements of Rule 32.3, Ala. R.Crim. P.”). Conspicuously absent from Boyd’s petition are facts and allegations that would tend to establish that Boyd would have been entitled to the services of a court-funded expert. Ex parte Moody, 684 So.2d 114, 119 (Ala.1996) (u[T]he indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense.”) (Emphasis added.) Without such a showing in the averments of the Rule 32 petition, Boyd’s petition fails to state a claim upon which relief may be granted, as he has not alleged facts that, if true, would establish deficient performance or prejudice by trial counsel.
“ ‘The claim is dismissed.’
“(C. 469-71.)
■ “We agree with the circuit court’s findings, and we adopt them as part of this opinion. As with the previous claim, Boyd’s claim in this regard does not provide a ‘clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.’ Rule 32.6(b), Ala. R.Crim. P. (Emphasis added.) The claim offers a conclusion — inadequate performance of counsel — where no facts creating the offered conclusion have been disclosed. As the circuit court correctly found, Boyd’s petition does not disclose what type of expert counsel should have been obtained, or the manner in which any such expert would have countered the State’s expert testimony. See Williams v. State, 783 So.2d 108, 129-130 (Ala.Crim.App.2000), cited by the circuit court in its order of dismissal. This claim amounts to a bare general assertion of Boyd’s subjective opinion that because he was convicted, his counsel should have performed differently. Thus, the circuit court correctly ruled that the claim had not been sufficiently pleaded.
“Boyd has not alleged how his trial counsel’s conduct was deficient or how the outcome of his trial would have been different had his trial counsel performed differently regarding this claim. Therefore, he has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Boyd failed to state a claim upon which relief could be granted, summary disposition of this claim was appropriate.”
913 So.2d at 1131-33.
Although Yeomans asserts generally the types of experts whose assistance he contends his trial counsel should have *1029 sought, Yeomans has not pleaded the specific “manner in which any such expert would have countered the State’s [evidence]” during the guilt phase, nor has he pleaded sufficient facts demonstrating that additional experts were “absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense.”[6] Boyd, 913 So.2d at 1133. Thus, Yeomans’s conclu-sory assertions in support of this claim are analogous to those discussed above in Boyd, and the circuit court properly dismissed this claim. See Rule 32.3 and 32.6(b), Ala. R.Crim. P.

Mental-Health- or Intelligence-Expert Claim

In paragraphs 43-46 of his amended petition, Yeomans alleged that his trial counsel was ineffective for failing to hire an intelligence expert or a mental-health expert to “specifically investigate! ] Yeo-mans’[s] lack of intelligence, including whether he was mentally retarded or deficient.” (C. 314.) Yeomans alleged:
“Such an expert could have explained to the jury the difference between, and meaning of, Mr. Yeomans’s various IQ scores, including the critical fact that initial IQ scores — in Mr. Yeomans’s case a 67 — are regarded as most accurate. Finally such an expert could have explained why Mr. Yeomans’[s] low intelligence decreased his culpability for the murders.”
(C. 314.) Yeomans also alleged that such an expert could have assisted with evaluating “the history of mental retardation and low intelligence in Mr. Yeomans’[s] family.” (C. 315.)
As the State points out in its brief to this Court, Yeomans has “failed to identify any expert who could have been hired and failed to allege how expert testimony concerning mental retardation would have helped Yeomans during the guilt phase of his trial.” (State’s brief, p. 24.) Yeo-mans’s allegations in his Rule 32 petition, as set forth above, are properly viewed as alleging a claim based on Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which relates to issues decided in the penalty phase. We address the penalty-phase aspect of this claim below.
To the extent Yeomans is alleging ineffective assistance- of counsel for failing to hire an additional mental-health or intelligence expert to assist during the guilt phase, we agree with the circuit court’s conclusion that this claim is insufficiently pleaded and is refuted by the record. The record from Yeomans’s direct appeal indicates that two forensic psychologists evaluated his mental condition and whether Yeomans was competent to stand trial. (Trial C. 20-22, 27-28, 91-93.) Yeomans has not alleged that any additional expert assistance would have called into question the determination, for purposes of the guilt phase of his trial, that Yeomans was not criminally insane or that he was competent to stand trial. Yeomans has not demonstrated that the circuit court erred in summarily dismissing this claim.
*1030 2.
In paragraphs 47-49 of his amended petition, Yeomans alleged that “trial counsel failed to effectively conduct voir dire of the jury pool.” (C. 315.) Specifically, Yeo-mans alleged that trial counsel should have moved to strike for cause Juror D.H. According to Yeomans,
“[D.H.] answered in the affirmative when asked, both by defense counsel and the State, whether a defendant should be sentenced to death regardless of the circumstances if he is convicted of capital murder. Trial counsel inexplicably failed to strike this juror for cause. There was no strategic reason to keep such a juror. But for this juror’s impact on the deliberations and verdict, there is a reasonable probability that the verdict would have been different and Mr. Yeo-mans would not have been sentenced to death.”
(C. 316.) The circuit court found that this claim was “without merit.” (C. 699.)
In its response to Yeomans’s petition and amended petition, the State pointed out that this claim is based on a misunderstanding of the record. The record from Yeomans’s direct appeal indicates that two potential jurors — D.H. and B.J.H. — shared the same last name and were in the same group (identified as “Panel 2” in the transcript in the record) for voir dire. (Trial R. 42.) The record indicates that B.J.H. responded to several questions during voir dire and was referred to as “Mr. H — ” several times during these exchanges. As the State points out again in its materials to this Court — a point Yeomans does not address in his reply brief to this Court — it is clear that the “Mr. H — ” who answered the question at issue was B.J.H., not D.H, Moreover, it is clear that Yeomans’s trial counsel moved to dismiss B.J.H. for cause, the State agreed that B.J.H. should be dismissed for cause, and the trial court in fact dismissed B.J.H. for cause, although its stated basis for doing so was because he was related to a witness. (Trial R. 210.)
In support of his claim, Yeomans’s petition cites the trial record at 68. Placed in context, the relevant exchange from that portion of the record is as follows:
“[YEOMANS’S COUNSEL]: I’ve got a last question, and I know you are happy for that. If James Yeomans were convicted of capital murder, is. there anyone out there that feels that he should get the death penalty automatically if he’s convicted of capital- murder?
“JUROR: (Indicating the affirmative.)
“[YEOMANS’S COUNSEL]: Yes, you oh the back.
“JUROR: Yes, I do.
“[YEOMANS’S COUNSEL]: And your name?
“JUROR: I am [P.H.]
“[YEOMANS’S COUNSEL]: You . feel that way Mr. [P.H.]?
“[P.H.]: Yes, sir.
“[YEOMANS’S COUNSEL]: Automatically, without any mitigating circumstances or anything?
“[P.H.]: Yes, sir.
“[YEOMANS’S. COUNSEL]: And how about you, sir?
“JUROR: Yes, sir.
“[YEOMANS’S COUNSEL]: And . what is your name?
“JUROR: [M.F.]
“[YEOMANS’S COUNSEL]: And do you feel he should get the death penalty regardless of 'the circumstances if he’s convicted of capital murder?
“[M.F.]: Yes, sir.
“[YEOMANS’S COUNSEL]: Mr. [IT.], how about you?
*1031 “MR. [H.]: Yes, sir.
“[YEOMANS’S COUNSEL]: You feel that way?
“MR. [H.]: Yes!
[YEOMANS’S COUNSEL]: Regardless of the circumstances?
“MR. [H.]: Yes, sir.
“[YEOMANS’S COUNSEL]: If he’s convicted, he should be electrocuted?
“MR. [HJ: Yes, sir.
“[YEOMANS’S COUNSEL]: And how about you, sir?
“JUROR: [R.H.], yes, sir, I do.
“[YEOMANS’S COUNSEL]: Do you feel that way strongly?
“[R.H.]: Strongly.
“[YEOMANS’S COUNSEL]: Anyone else?
‘ “JUROR: (No response.)
“[YEOMANS’S COUNSEL]: Does anybody else feel like if he is convicted that he ought to automatically get the ■ death penalty? ' "
“JURORS: (No response.)”
(Trial R. 67-68.) Later, in discussing with the trial court which jurors should be removed for cause, the following exchange occurred:
“[YEOMANS’S ’ COUNSEL]: Number 9, [Ja. D.B.] I can do three of them at the same time, and the other one is [Je. D.B.] — well, I believe it’s just those two, Judge. They both are the two on the first panel that said that they would send a man to the electric, chair, or send any person that was convicted of capital murder to the electric chair, without regard to any mitigating circumstances, or otherwise.
[[Image here]]
“[YEOMANS’S COUNSEL]: On Panel Two, Judge, we have four chal- ■ lenges and they are all on the same grounds that we just had on [Je. D.BJ.
That is number seventy-nine, [M.F.], [P.H.], he was the person that expressed those real open opinions, then [B.J.HJ and [R.H.]. On that Panel there■ was four of them that expressed the same opinion and they were all sitting in a group over there. ' ■
“THE COURT: I’m going to' grant it on [P.H.]. Pm also granting it on Mr. [HJ because he is kin to a witness. I will .grant it on [R.H.,] and we will call in [M.F.]. ■ " - '
“[DISTRICT ATTORNEY]: Your Honor, we would agree with them. If he wants them struck, that’s fine with us.” ‘
(Trial R. 204, 210.) Based on the quoted portions above, it is clear that B.J.H. is the “Mr. H.” referred to as being in the group of 4 jurors in Panel 2 who were the subject of Yeomans’s motion to strike for cause. Further, the record indicates that B.J.H. was not on the strike list, was not on the jury, and was not the subject of a peremptory strike by the State or by Yeomans. Thus, the record on direct appeal refutes this claim, and the circuit court did not err in summarily disposing of it. Rule 82.7(d), Ala. R.Criro. P.
3.
Paragraphs 36-39 of Yeomans’s amended petition- allege that Yeomans’s trial counsel was ineffective for failing to move for a change of. venue. Specifically, the petition alleges:
“36. :.. The murders in question occurred in .a very- small county in Alabama, where Mr. Yeomans’[s] mother, brother, father, uncles, aunts, grandfather, and even his grandmother were notorious and openly derided by the community for scandals and. other crimes, including unrelated murders by other family members. Coverage of Mr. Yeomans’ crime dominated the local me *1032 dia in Geneva County, as well as the surrounding counties, and even the neighboring state of Florida. Local newspapers, such as the Dothan Eagle, the Enterprise Ledger, and the Geneva Reaper, reported extensively on the murders and the trial. Local television and radio stations also covered the murders and trial, saturating the community with publicity.
“37. All but a few of the jury pool members were familiar with the highly publicized crime. In the face of the pretrial media satui-ation, these jurors could not have been neutral.... Thus, the court would likely have granted a motion to change venue, had trial counsel presented one.
“39. Trial counsel’s failure to move for transfer of venue cannot be attributed to reasonable trial strategy where trial counsel failed to conduct an adequate investigation into Mr. Yeomans’[s] (and his family’s) reputation in the community.”
(C. 311-12.) The circuit court dismissed this claim under. Rules 32.3, 32.6(b), and 32.7(d), Ala. R.Crim. P. Further, the circuit court stated that “[t]he jurors were subject to a thorough voir dire, and there is no evidence that a change of venue was warranted.” (C. 699.)
This Court; in affirming the summary dismissal of a claim that counsel was ineffective for failing to move for a change of venue, has stated:
“[Moody] pleaded no facts about the actual extent or nature of the media coverage that would indicate that it was biased or prejudicial or that it had saturated the community. In addition, he did not name a single juror who sat on his jury who had read or heard about the case. Contrary to Moody’s apparent belief, ‘the existence of widespread publicity does not require a change of venue.’ McGahee v. State, 885 So.2d 191, 211 (Ala.Crim.App.2003). Because Moody failed to allege sufficient facts in his petition that would indicate that he would have been entitled to a change of venue, he failed to plead sufficient facts to indicate that his appellate counsel was ineffective for not raising this claim on appeal. Therefore, summary dismissal of this claim of ineffective assistance of appellate counsel was proper.”
Moody v. State, 95 So.3d 827, 845 (Ala.Crim.App.2011).
In this case, although Yeomans pleaded generally that three local newspapers had “reported extensively on the murders and the trial,” Yeomans did not specifically name any juror who had read or heard about the case. Thus, Yeomans did not plead sufficient facts in support of this claim, and summary dismissal was proper.
Moreover, although counsel did not move for a change of venue, generally the “[djecision not to request a change of venue is not ineffective assistance of counsel, but is rather a matter of trial strategy.” Cox v. State, 660 So.2d 233, 235 (Ala.Crim.App.1994). See also Huis v. State, 301 Ark. 572, 580, 785 S.W.2d 467, 471 (1990) (“The decision of whether to seek a change of venue is largely a matter of trial strategy and therefore not an issue to be debated under our post-conviction rule.”); Wilson v. State, 286 Ga. 141, 143, 686 S.E.2d 104, 107 (2009) (“ ‘[T]he decision whether ... to file ... a motion for change of venue, as with other motions, is a matter of trial strategy or tactics.... ’ ”); People v. Aspy, 292 Mich.App. 36, 808 N.W.2d 569 (2011) (“‘The decision whether or not to move for a change of venue constitutes a matter of trial strategy.’”); Brawner v. State, 947 So.2d 254, 262 (Miss.2006) (“This Court has held that defense counsel is *1033 under no duty to attempt to transfer venue; therefore, the decision not to seek a change of venue, would • fall within the realm of trial strategy.”).
Finally, the record from Yeomans’s direct appeal indicates that the jury was sequestered during trial, and, as noted above, the circuit court found, based on its personal knowledge from presiding over Yeomans’s trial, that “[t]he jurors were subject to a thorough voir dire, and there is no evidence that a change of venue was warranted.” This fact — that the circuit judge had personal knowledge of the answers the veniremembers gave during voir dire regarding media exposure — also supports the circuit court’s summary dismissal of this claim. See, e.g., Ex parte Walker, 800 So.2d 135, 138 (Ala.2000) (“A circuit court may summarily dismiss a Rule 32 petition without an evidentiary hearing if the judge who rules on the petition has ‘personal knowledge of the actual facts underlying the allegations in the petition’ and ‘states the reasons for the denial in a written order.’ Sheats v. State, 556 So.2d 1094, 1095 (Ala.Crim.App.1989).”).
4.
Yeomans- alleges that trial “[cjounsel was ineffective for failing to challenge the State’s case with respect to: (1) evidence regarding the alleged theft of his wife’s purse, and (2) evidence regarding a self-defense argument.” (Yeomans’s brief, p. 49.)
a.
Paragraphs 55-59 of Yeomans’s amended petition allege that counsel failed to undertake any investigation of the purse that supported the robbery component of the capital-murder conviction under § 13A-5-40(a)(2), Ala.Code 1975. Yeo-mans asserts that “[h]ad counsel [performed an investigation], even in a cursory manner, it would have been clear that the ‘purse’ that Yeomans allegedly stole from his wife was actually a diaper bag that constituted ‘marital property.’ ” (Yeo-mans’s brief, pp. 49-50). According to Yeomans, his “son, Alan, was available to testify that the ‘purse’ was actually a diaper bag.”[7] (Yeomans’s brief, p. 50.) In support of this claim, Yeomans contends that the “diaper bag” was “marital property” that belonged to Yeomans. He raises the novel legal argument that if the bag belonged to him as marital. property, he could not be guilty of robbery. Yeomans cites a lone case from the State of Georgia, Barron v. State, 219 Ga.App. 481, 482-83, 465 S.E.2d 529, 529-30 (1995).
In Barron, the defendant-husband and the victim-wife were involved in, a divorce proceeding. The wife took several items of personal property from the husband’s car, and the husband used physical force to recover the personal property. The husband appealed his conviction for “simple battery,” and the Georgia Court of Appeals affirmed. In part, the Georgia court held that the husband was not entitled to assert the defense, recognized under a Georgia statute, that in sorhe circumstances justified the use of force to regain possession of personal property. The Georgia court reasoned that “[t]he defense was unavailable because the victim’s conduct in taking personal property from the lawful possession of defendant was neither tortious nor criminal interference within the meaning of the statute.” Specifically, there was no theft because, the court reasoned, “the personal property taken by the victim was not the ‘property of another’ *1034 within the definition provided by OCGA § 16-8-1(3) which excludes property of a spouse from the definition of. this term.” 219 Ga.App. at 483, 466 S,E.2d at 530.
Barron, which is based on statutory provisions in Georgia that do not have corresponding counterparts in the Alabama Code, does not support Yeomans’s theory that he could not have been convicted of robbery if the bag was considered to be “marital property.” As the State points out, § 13A-8-44, Ala.Code 1975, forecloses this possibility. That section provides: “No person may submit in defense against a prosecution for robbery in any of its degrees that there was no theft because the taking was under a claim of right. Claim of right is not a defense under this article.” The Commentary to the statute further explains:
“Section 13A-8-44 explicitly disallows claim of right as a defense under this ■article. A traditional concept of robbery ■is larceny by force. Larceny requires an animus furandi; hence, if defendant took under a claim- of right, there could be no theft. For his defense to theft, see § 13A-8-12. Arguably, there also could be no robbery if claim of right were available. However, the basic theory of this chapter is to protect the citizen from harm and from fear for his or another’s health and safety, as well as the protection of his property. The danger to the. citizen from the use or threat of force is present regardless of a claim of right. In addition, policy dictates that the Criminal Code should reflect favor upon citizens asserting their property rights through orderly processes of law rather than by force.”
Thus, because there is no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed. See, e,g., Lee v. State, 44 So.3d 1146, 1173 (Ala.Crim.App.2009) (counsel cannot be ineffective for failing to raise a claim that has no merit).
Moreover, on. direct appeal, this Court, in summarizing the evidence presented to support the robbery component of Yeo-mans’s capital-murder conviction under § 13A-5-40(a)(2), Ala.Code 1975, stated:
“The evidence here was more than sufficient to permit the jury to determine that Yeomans committed a murder during the course of a robbery. Julie’s son, Casey, testified that Yeomans took Julie’s purse with them when he drove them to Florida. (R. 518.) Alan Yeo-mans, the appellant’s son who walked with Yeomans to the Simmonses’ house, testified" that, immediately after Yeo-mans killed the victims, he told Alan to get the keys to Julie’s car. Alan said thht the keys were in Julie’s purse and that the purse was in the car with them when they left the scene and traveled to Florida. (R. 665-66.) Alan also testified that Yeomans handed the purse to him and told him to put it in the car. In the tape-recorded statement he made to an investigator, Yeomans admitted that he and Alan took Julie’s purse with them when they drove to Florida. (R. 588.) Charles Richards, a lab analyst with the Florida Department of Law Enforcement, testified that, from the trunk of the vehicle Yeomans drove-to Florida after the murders, he recovered a purse with at least one item that had the name ‘Julie’ on it. (R. 538-41.) The jury had before it ample evidence from which it could reasonably conclude that Yeomans committed a robbery.”
Yeomans, 898 So.2d at 893 (emphasis added). Thus, besides Alan — who indeed testified that the bag was a purse — two other witnesses at trial identified the bag as a purse, and Yeomans, in his tape-recorded statement, admitted that he took Julie’s purse. Further, the transcript of Casey’s *1035 testimony at trial indicates that the purse was introduced into evidence as State’s Exhibit 21, and Casey identified it as “the one [purse] that my mama always carried around.” This testimony and the indication that the purse was admitted into evidence directly refutes Yeomans’s assertion in the circuit court that there was a “conspicuous absence' of any visual evidence in the record of the so-called ‘purse’ ” (C. 616) and that trial counsel was ineffective for “failing] to notice [the] absence” in evidence of a photograph of the purse (C. 321).
The circuit court did not err in summarily dismissing this claim.
b.
Yeomans asserts that '“[c]ounsel was also ineffective for- failing to present a coherent self-defense argument.” (Yeo-mans’s brief, p. 52.) This claim was raised in paragraph 53 of the amended petition. (C. 318-19.)
Yeomans alleged that an adequate investigation by counsel would have led to the discovery “that one of the victims attacked Mr. Yeomans’s son during the confrontation that led to the killings and that Mr. Yeomans had been attacked with a crowbar during that confrontation.” (C. 318-19.) The evidence at trial indicated that Yeomans’s son, Alan, and Jake Simmons were involved in an altercation, but the evidence indicated that Alan was the aggressor. There was no indication in any of the evidence presented at trial — including Yeomans’s contradictory statements to law enforcement — that Yeomans had acted in self-defense.
We agree with the State that this claim is insufficiently pleaded. Because Yeomans - failed to plead -the supporting evidence with any more specificity — such as stating which victim .allegedly attacked Yeomans’s son and who allegedly attacked Yeomans with a crowbar, as well as what additional investigation by counsel would have - discovered that information — this claim was not pleaded' sufficiently under Rules 32.3 and Rule 32.6(b), Ala. R.Crim. P. See, e.g., Waddle v. State, 784 So.2d 367, 369 (Ala.Crim.App.2000).
5. ■
Yeomans alleges his trial “[c]ounsel was ineffective for failing to object ... on the ground of relevance .... to the admission of post-mortem pictures of the victims and the victims’ dog as well as to a videotape of the crime scene.” (Yeomans’s brief, p. 55.) Yeomans acknowledges that “[t]rial counsel objected to a few of these photographs on prejudice grounds.” (Yeomans’s brief, p. 57 n. 5.) Yeomans contends that if trial counsel had objected to these photographs on the basis of relevancy, this Court could have reviewed them on direct appeal under the abuse-of-discretion standard rather than for plain error, and, he asserts, this Court would have held that the admission of the photographs was reversible error. The circuit court, in its order denying the petition, stated “that the claim of improper[ ] admission of the photographs and videotapes was addressed at trial or on direct appeal, and is therefore dismissed.” (C. 698.) Further,- the circuit court held that there was no merit to the ineffective-assistance-of-counsel claim based on a failure to object to the introduction of the photographs and videotape. (C. 700.)
Initially, we note that on direct appeal, although this Court stated that the photographs were “subject to review only for plain error” as to relevancy, 898 So.2d at 894, this Court in fact reviewed the photographs of the victims and the victims’ dog and, with regard to relevancy, specifically held that there was no error — not merely that there was no plain error — in their admission. 898 So.2d at 896-97.
*1036 As to the videotape of the crime scene, this Court’s opinion on direct appeal only briefly mentions it, and Yeo-mans’s amended petition and his brief to this Court do not describe the video with any specificity, other than stating that it was a “videotape of the crime scene.” This aspect of the claim is not sufficiently pleaded. See Rules 32.3 and 32.6(b), Ala. R.Crim. P. Moreover, a videotape of a crime scene, even though it is gruesome, is generally admissible in a capital-murder trial. See Mack v. State, 736 So.2d 664, 673-74 (Ala.Crim.App.1998) (finding no abuse of discretion in the admission of a videotape of a crime scene and stating that “• ‘ “[p]erpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence” ’ ” (citations omitted)). Thus, there is no merit to Yeomans’s claim of ineffective assistance, because there is no merit to the underlying claim that the photographs and videotape were inadmissible. Lee, 44 So.3d at 1173.
6.
Yeomans alleges that “[c]ounsel was ineffective for failing to request a jury instruction on the lesser-included offense of robbery.” (Yeomans’s brief, p. 58.) Yeo-mans asserts that “[b]ecause evidence ‘showed that the bag was taken only as an “afterthought,” ’ the ‘alleged “robbery” was ... a separate crime from the murder.’” (Yeomans’s brief, p. 58 (quoting the amended petition).) The circuit court held that Yeomans was not entitled to an instruction on the lesser-included offense of robbery and that the corresponding claim of ineffective assistance of counsel was therefore without merit.
This claim is insufficiently pleaded. See Rule 32.6(b), Ala. R.Crim. P. As this Court noted on direct appeal: “The evidence ... was more than sufficient to permit the jury to determine that Yeomans committed a murder during the course of a robbery.” Yeomans’s son, Alan, “testified that, immediately after Yeomans killed the victims, he told Alan to get the keys to Julie’s car.” Alan said “that Yeomans handed the purse to him,” that the keys were in the purse, and that Yeomans told Alan to put the purse in the car. 898 So.2d at 893. Yeomans offers no specific factual allegations to counter this evidence or to support his conclusory assertion that the “evidence showed the bag was taken only as an afterthought.” Accordingly, Yeomans has not pleaded facts demonstrating that he would have been entitled to an instruction on robbery as a lesser-included offense. See, e.g., Howard v. State, 85 So.3d 1054, 1060 (Ala.2011) (“ ‘ “A court may properly refuse to charge on a lesser included offense ... when ... it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense (quoting Fox v. State, 659 So.2d 210, 212 (Ala.Crim.App.1994), quoting in turn Anderson v. State, 507 So.2d 580, 582 (Ala.Crim.App.1987))); cf. Johnson v. State, 479 So.2d 1377, 1380-81 (Ala.Crim.App.1985) (“Even had the appellant killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.”). Thus, there is no merit to the ineffective-assistance-of-counsel claim based on a failure to request such a charge. Lee, supra.
7.
Yeomans alleges that “[c]ounsel was ineffective for failing to object to the court’s improper instruction on reasonable doubt.” Specifically, Yeomans asserts that “trial counsel failed to object to the court’s instruction (which it gave twice) to the jury *1037 that the State had the burden of proving ‘beyond a reasonable doubt and to a moral certainty’ each element of the offense.” (Yeomans’s brief, p. 61.)
On direct appeal, this Court reviewed the underlying instructions on which this allegation of ineffectiveness is based. We stated:
“Yeomans argues that the trial court’s instruction on reasonable doubt allowed the jury to convict him on a standard less than that required by constitutional principles, citing Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Yeomans did not object to the jury charge at trial, so we will review his claim only for plain error.
“The trial court’s -instruction on- reasonable doubt, the presumption of innocence, and the State’s burden of proof spans six pages. Yeomans does not identify which portion of the jury charge relating to the reasonable-doubt instructions he finds objectionable. However, because he cites Cage v. Louisiana, and mentions the Cage trial court’s erroneous use of the terms ‘an actual substantial doubt’ and ‘a grave uncertainty,’ we therefore assume that it was the. trial court’s definition of reasonable doubt in this case that Yeomans now finds objectionable.
“Trial courts are vested with broad discretion when formulating jury charges. When this Court reviews a jury charge, the portions challenged are not considered in isolation but are considered as part of the whole charge. E.g., Duke v. State, 889 So.2d 1, 30 (Ala.Crim.App.2002). We have reviewed the trial court’s instruction on reasonable doubt and find no plain error.
“The jury charge included the following instructions on reasonable doubt:
“ ‘The , term, . “reasonable ' doubt,” means a doubt which has some good reason for [its] arising out of the evidence in the case, such a doubt as you are able to find in the evidence a reason for. It means a reasonable doubt growing out of the unsatisfactory nature of the evidence in the case. It does not mean a doubt which arises from some mere whim, or from any groundless surmise or guess.’
“(R. 727.)
“The court further instructed the jury:
“‘So, by “reasonable doubt,” it’s not meant' absolute certainty. There is no such thing as absolute certainty in human affairs, for justice is, after all, but an approximate science and its ends are not to be defeated by a failure of strict and mathematical proof.’
“(R. 728.)
“The court charged the jury that it could not convict Yeomans on mere possibility, surmise, or speculation, however strong they may be.. (R. 729.) It again defined a reasonable doubt as one based on the evidence only, or from the lack of evidence. The court also stated in its instruction, ‘If after, reviewing the evidence, the State fails to convince you beyond a reasonable doubt and to a moral certainty that each of the elements exists, you must find the Defendant innocent of the charges.’ (R. 729-30.)
“The charges quoted above, along with the remaining instructions on reasonable doubt, fully explained the legal principles on the concept of reasonable doubt. To the extent Yeomans contends that the jury charge somehow violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because it uses the term ‘moral certainty,’ we note that two of the jury instructions on reasonable doubt included in the court’s charge were given at Yeomans’s *1038 request: (C. 215,226.) If any error had occurred as a result of the use of the term ‘moral certainty5 it would have been error invited by Yeomans.
“However, we find that the use of the term ‘moral certainty5 resulted in no error. This Court has previously examined cases in which the term ‘moral certainty5 was used, and we have found that when the jury charge as a whole correctly conveyed the concept of reasonable doubt, reversal was not due. E.g., Williams v. State, 710 So.2d 1276, 1335 (Ala.Crim.App.1996). See also Victor v. Nebraska, 511 U.S. 1, 16, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (use of the term ‘moral certainty5 in context of jury charge as a whole did not suggest a standard of proof lower than the standard required by due process).
“Having carefully reviewed the jury instruction on reasonable doubt in the context of the charge as a whole, we find no plain error. The jury was adequately instructed on the concept of reasonable doubt, and Yeomans is entitled to no relief on the claim.55.
898 So.2d at 898-99.
Thus, on direct appeal the claim of error in the instruction regarding reasonable doubt — on which the instant claim of ineffective assistance of counsel is based — was held to be without merit. Accordingly, the circuit court properly dismissed the ineffective-assistance-of-counsel claim. Lee, supra.
B.

Penalty-Phase Ineffective-Assistance Claims

h

Yeomans claims that his “[cjounsel’s performance was deficient for his failure to present coherent mitigating evidence regarding his mental retardation and deficiency and for failing to present evidence in support of his plea of not guilty by reason of severe mental disease or defect.55 Specifically, Yeomans asserts “that he is ‘severely mentally deficient to the point of retardation5 and that trial counsel ‘failed to adequately demonstrate that fact at any point in the trial.5 55 ■ (Yeomans’s brief, p. 63 (quoting the amended petition).) The circuit court, in rejecting this.claim, stated: “The Court finds that the claim- that trial counsel was ineffective in the penalty stage for failing to present a complete picture of mitigation during the penalty stage is without merit and is refuted by the record at the guilt phase and sentencing phase of the trial.” (C. 700-01.).
On direct appeal, ‘Yeomans argue[d] that his execution would be unconstitutional because he is mentally retarded.” 898 So.2d at 900. Yeomans cited Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in support of his claim.[8] In analyzing this claim, this Court discussed the evidence presented in the trial court regarding Yeomans’s level of intellectual functioning. This Court stated:
“In Issue VIII of his brief to this Court, Yeomans argues that his execution would be unconstitutional because he is mentally retarded; he cites Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in support of his claim. The State argues that Atkins does not apply because Yeomans is not mentally retarded.
“Our review of the record indicates that this claim is being raised for the *1039 first time on appeal. Evidence and testimony about Yeomans’s -level of-intellectual functioning' was presented at trial, and defense counsel argued that Yeo-mans’s low level of intellectual functioning was a mitigating factor. However, when the prosecutor argued at the sentencing hearing before the trial judge that it was irresponsible for Yeomans to claim that he was mentally retarded after he had spent a lifetime functioning and working in society, defense counsel responded in his closing argument to the court, With all due respect to [the prosecutor], Mr. Yeomans didn’t complain that he was retarded.’ (R. 832) (emphasis added). Defense counsel’s statement accurately reflected the defense strategy and the evidence presented at trial. Defense counsel stated to the jury during his argument at the guilt phase of the trial that the jury should ‘think about [Yeomans’s] -mental capabilities and what all he went through and what he had to endure.’. (R. 719.) At the penalty phase, defense counsel merely argued that Yeomans ‘suffers from an extremely low IQ.’ (R. 776.) Thus, we find that Yeomans’s claim that he is mentally retarded and that his execution would be unconstitutional to be á newly raised claim that must be reviewed only for plain error. We find no plain error.
“In Atkins v. Virginia, supra, the United States Supreme Court held that execution of mentally retarded defendants violates the Eighth Amendment’s prohibition against cruel and unusual punishment. 536 U.S. at 321, 122 S.Ct. 2242. The Court did not define a legal standard for mental retardation, but left the definition of the term and the enforcement of the newly announced rule to the states. The Alabama Legislature has yet to enact a statute to address the holding in Atkins. The only Alabama statute that provides assistance in making this determination is § 15-24-2(3), Ala.Code 1975, which- defines a ‘mentally retarded person’ as ‘[a] person with significant subaverage general intellectual functioning resulting in. or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.’
“The Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002), in determining whether the appellant 'was mentally retarded and' therefore not subject to éxecution, applied the broadest definition of mental retardation rec-ognizéd in those states that prohibit the execution of the mentally retarded. The Court stated:
“ ‘Those states with statutes prohibiting the execution of a mentally retarded defendant require that a. defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ. of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).’
“851 So.2d at 456. In its evaluation of the evidence presented at trial, the Court noted that Perkins had a full scale IQ of 76 and that he had completed college level courses while in prison and that he had maintained jobs and interpersonal relationships during his adult life. Id. . In light of the standards that currently exist in - Alabama regarding the evaluation of Yeomans’s claim, we find that the record does not establish that Yeomans is mentally retarded.
“In its sentencing order,, the trial court summarized the evidence regarding Yeomans’s intellectual status and- de *1040 termined that he is not mentally retarded. The court stated:
“‘The Court further finds that the Defendant had his first psychological or mental evaluation when he was seven years old. At this time he was administered the Stanford Binet Intelligence test which resulted in his achieving an I.Q. score of 67. This I.Q. score falls within the middle range of mental deficiency. At age nine, he was evaluated again. On administration of the Wechsler Intelligence [Scale] for Children Revised, he achieved a full scale I.Q. score of 83 which falls within the low average range of intelligence. His final evaluation occurred at age seventeen. At this time the administration of the Wechsler Adult Intelligence Scale resulted in a full scale I.Q. score of 72 which falls near the lower limit of the borderline range of intelligence. Mr. Yeomans has been employed most of his adult life. He has been married three times and has been head of his family. Even though the Defendant had a tumultuous upbringing and was currently functioning in the low average range of intelligence, he has and does function “normally” in society. He is not mentally ill and he is not mentally retarded.’
“(C. 269.)
‘We agree with the trial court’s analysis of the evidence. We make these additional comments based on our review of the evidence. The Stanford-Binet Intelligence test was also administered to Yeomans when he was 11 years old, and he achieved a score of 78. This score placed him in the upper borderline range of intellectual functioning. (C. 194.) Dr. D’Errico, a psychologist and certified forensic examiner who conducted the court-ordered forensic evaluation of Yeomans, testified that he had reviewed Yeomans’s school records, including three psychological reports of intellectual assessments. He had also interviewed Yeomans. Dr. D’Errico determined that Yeomans was not mentally retarded, but was functioning in the borderline range of intelligence. The evidence indicates that Yeomans’s level of general intellectual functioning is not significantly subaverage.
“Furthermore, we agree with the trial court that Yeomans did not manifest significant deficits in his adaptive behavior. The commonly used definition of mental retardation requires that these deficits be manifested before the age of 18 years. Ex parte Perkins, 851 So.2d at 456. Yeomans was placed in special-education classes throughout much of his academic career. Yeomans’s second grade report card does not indicate that he was in special-education classes, and he made A’s and B’s during the year. (C. 196.) The Individualized Education Program form completed while Yeomans was in the eleventh grade indicates that Yeomans was assigned to shop class and to a driver’s education class. (C. 159.) Yeomans’s younger sister testified that Yeomans had a low I.Q. and that he could not read or write. None of the evidence establishes that Yeomans suffered significant deficits in his adaptive behavior before the age of 18 years.
“Moreover, the testimony at trial indicated that, in adulthood, Yeomans did not suffer significant deficits in his adaptive behavior. To the contrary, he was steadily employed, he married more than once, fathered and raised several children and, according to defense testimony, he tried to teach his children right from wrong.
“Considering all of the evidence in the record before us and applying the broad definition of mental retardation set forth *1041 by the Alabama Supreme Court in. Ex parte Perkins, supra, we are convinced that Yeomans is not mentally retarded. Therefore, Atkins v. Virginia, supra, does not preclude imposition of the death sentence in this case. See also, Ex parte Smith, [Ms. 1010267, March 14, 2003] — So.2d - (Ala.2003); Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003). Yeomans is not entitled to any relief on this claim.”
898 So.2d at 900-02.
As our opinion in Yeomans makes clear, the trial court had before it significant evidence regarding Yeomans’s level of intellectual functioning; that evidence included expert testimony and substantial documentary evidence regarding Yeo-mans’s intelligence. Further, as our opinion indicates, trial counsel ultimately did not argue that Yeomans was mentally retarded; rather, counsel made the decision to argue as a mitigating circumstance that Yeomans had a low level of intellectual functioning. This Court, when viewing the considerable evidence regarding Yeo-mans’s level of intellectual functioning, was “convinced that Yeomans is not mentally retarded.” 898 So.2d at 902. We cannot say, in reviewing this evidence again, that trial counsel’s decision not to argue that Yeomans was mentally retarded was an unreasonable one.
In his amended petition, however, Yeo-mans alleged that counsel was ineffective for failing to present the following evidence:
— “[A]t the age of seven he received an IQ score of only 67 on the Stanford Binet Intelligence Test and was consequently placed in a ‘Special Education Class for the Educable Mentally Retarded’ ”;
— “[A]t the age of seventeen, he scored only 72 on the Wechsler Adult Intelligence Scale, where he tested in the ‘extremely poor ability’ range on vocabulary and in the ‘borderline ability* range — a range lower than ‘below average ability* — on his ability to ‘comprehend general facts’ and to use ‘judgment in practical situations’; as a result he was categorized as ‘educably mentally retarded’ ”;
— “[H]e has struggled to find and maintain employment and has never held a job that required more than ‘minimal intelligence’ ”;
— “[A]s a partial result of his diminished mental capacity he has been unable to care for, provide medical care for, or properly supervise his children”;
— “[H]e has struggled to care for himself, has been evicted from his home and has endured periods of homelessness”;
— “[EJvidence from ‘family members who would willingly have testified that Yeomans cannot add, could barely read until his nine-year-old son taught him to sound out words, and was delayed even learning to speak’ ”; and
— Evidence “from his coworkers, who could have described the ‘minimal intelligence required’ to perform the jobs that Yeomans held.”
(Yeomans’s brief, pp. 64-65 (quoting the amended petition).)
The above-quoted portion of Yeomans demonstrates,- however, that much of this evidence in fact was presented, and the remainder of it would have been largely cumulative of the evidence that was presented.
“ ‘ “[T]he' failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional viola *1042 tion.” Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir.2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006)).’ Eley v, Bagley, 604 F.3d 958, 968 (6th Cir.2010), ‘This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel’ United States v. Harris, 408 F.3d 186, 191 (5th Cir.2005). ‘Although as an afterthought this [defendant’s father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffectiv.e for failing to present cumulative evidence.’ Darling v. State, 966 So.2d 366, 377 (Fla.2007).”
Daniel v. State, 86 So.3d 405, 430 (Ala.Crim.App.2011).
“ ‘ “[T]he selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable.” ’ Johnson v. State, 333 S.W.3d 459, 463-64 (Mo. banc 2011) (citation omitted). Trial counsel will not be found ineffective for failing to present cumulative evidence.”
Roberts v. State, 356 S.W.3d 196, 202-03 (Mo.Ct.App.2011). See also Card v. State, 497 So.2d 1169, 1177 (Fla.1986) (“[W]e refuse to render counsel ineffective for failing to proffer testimony that would have been entirely cumulative.”). Yeomans’s petition fails to recognize the substantial evidence that in fact was presented to the trial court, and his petition does not plead facts demonstrating that his counsel was deficient in failing to present that part of the above-listed evidence that was not cumulative to what was presented to the trial court. See Daniel, supra; Boyd, supra.
Yeomans also asserts that trial counsel was ineffective for failing to procure
“expert assistance to illuminate his mental retardation and deficiency, including: the significance of Yeomans’s ‘familial history of mental retardation and deficiency’; his ‘significant mental impairments’; his ‘stunted mental and academic development;’ the difference between, and meaning of, Yeomans’s various IQ scores, including the critical fact that one’s initial IQ score — in Yeo-mans’s case, a 67 — is regarded as most accurate; and the evidence that family members were able and willing to provide testimony regarding Yeomans’s family history of mental impairment and Yeomans’s own stunted intellectual and academic development.”
(Yeomans’s brief, pp. 65-66.) In Jackson v. State, 133 So.3d 420 (Ala.Crim.App.2009) (opinion on return to remand), this Court addressed a claim that counsel had been “ineffective for failing to obtain and to present expert testimony” during the sentencing phase.[9] 133 So.3d at 451. In affirming the circuit court’s dismissal of this claim, we stated:
“Jackson failed to identify, by name, any experts who could have testified, *1043 nor did he identify the content of any expert’s expected testimony. As we stated in Daniel v. State, 86 So.3d 405 (Ala.Crim.App.2011):
“‘Daniel failed to identify, by name, any forensic or DNA expert who could have testified at Daniel’s trial or the content of the expert’s expected-testimony. Accordingly, Daniel failed to comply with the full-fact pleading 'requirements of Rule 32.6, Ala. R.Crim. P. See McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007) (claim that counsel was ineffective for failing to retain an expert not sufficiently pleaded because expert was not identified); Woods v. State, 957 So.2d 492 (Ala.Crim.App.2004), rev’d on other grounds, 957 So.2d 533 (Ala.2006) (Claim of ineffective assistance of counsel not sufficiently pleaded because Woods failed to identify an expert by name).’
“86 So.3d at 425-26. Jackson failed to satisfy' the full-fact pleading requirements of Rule 32.6, Ala. R.Crim. P.; therefore, this claim was correctly dismissed.”
Jackson, 133 So.3d at 452.
In the present case, although the petition alleges that trial counsel should have sought the assistance of an expert to testify, for example, that “one’s initial IQ score ... is regarded as most accurate,” the petition did not identify, by name, any expert who could have presented that specific testimony — or even testified at all — at Yeomans’s trial. Yeomans therefore failed to satisfy the full-fact pleading requirements of Rule 32.6, Ala.R.Crim. P. Jackson, supra. Cf. Ray v. State, 80 So.3d 965, 989-90 (Ala.Crim.App.2011) (citing with approval Ward v. Hall, 592 F.3d 1144, 1173 (11th Cir.2010), for the proposition that “ ‘[t]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial,’ ” as well as citing Gilbert v. Moore, 134 F.3d 642, 654-55 (4th Cir.1998), for the conclusion that “in light of the reports of the mental examinations performed, counsel’s failure, to retain a psychiatric expert to investigate this area further or .to provide mitigating testimony [did not. fall] outside the broad range of professionally adequate conduct.”).
2.
Yeomans asserts that “[cjounsel was Ineffective for failing to adequately investigate and present a complete picture of the available mitigation evidence concerning Yeomans’s social history.” (Yeomans’s brief, p. 70.) Specifically, Yeomans alleges:
-“‘[Cjounsel should have obtained complete and accurate information regarding Mr. Yeomans’ family and social history, educational history, .,. mental health history, employment and training history, prior adult-- and juvenile correctional experiences’ including from' ‘medical records, public assistance - records, and housing records.’ Had counsel done so, he would have discovered the following: (1) -‘copious evidence from multiple witnesses — including .. [his] mother, brother, and childhood friends — regarding the severe abuse suffered.by [his] mother during her pregnancy with [him]’; (2) ‘a pattern of mental limitations throughout generations of [his] family and the family’s long-term voluntary and involuntary interactions .with county, mental health services’; and (3) ‘numerous witnesses, including [his] immediate and extended family members, [who] would have testified to [these] mitigating .circumstances from [his] childhood.’”-
*1044 (Yeomans’s brief, pp. 71-72 (quoting the amended petition).) The circuit court, in dismissing this claim, stated that the claim was “without merit” and “refuted by the record at the guilt phase and sentencing phase of the trial.” (C. 701.)
We agree with the circuit court. Moreover, Yeomans’s broad allegations do not satisfy the pleading requirements of Rule 32.6, Ala. R.Crim. P. Additionally, much of the evidence Yeomans asserts that trial counsel should have discovered was presented during the guilt phase of Yeo-mans’s trial. Our summary of the evidence presented at trial included the following:
“Tammy Baxter, who had previously been married to Yeomans for 10 years, testified that Yeomans was a good, kind man, but that he was not smart and that he could neither read nor write. She stated that Yeomans had been a good father to their children and had taught them right from wrong.
‘Yeomans’s sister, Tammy Kennedy, testified that their father was physically abusive to their mother and to all of the children. She said that Yeomans could not read or write well, but that he was a good father to his children and that he was not a violent man. Kennedy testified that when Yeomans came to her house on the day of the murders, he told her that two men had killed the victims.
“Alan Yeomans, one of the appellant’s sons, also testified at trial. He testified that, at the time of the murders, he was living at home with his father, Julie, Lee Ann, Brandon, and Casey. On the Sunday before the murders, Yeomans and Julie got into an argument and Julie pulled a knife on Yeomans, Alan said. Julie and Lee Ann went to her parents’ house; Brandon and Casey were already at the Simmonses’ house. Late Sunday evening, Yeomans asked Alan if he wanted to walk with him to get Lee Ann. Alan said they hitched a ride with a truck driver and they walked the remainder of the distance of 20 or more miles to the Simmonses’ house. They waited in the abandoned house next door because they arrived early in the morning. After they saw the children in the car, Alan said, they walked over and Yeomans asked Julie if he could have Lee Ann. Julie refused.
“Alan testified that an argument among his father, Julie, and Sylvia then began. Sylvia yelled to Yeomans that he could not have Lee Ann and that he could not even touch her. Jake went inside to get a gun, which he then propped against the frame of the front door, and he came outside. Julie and Sylvia pushed Yeomans on the chest and hit him in the face, Alan said, and Jake ran toward the house to get. his gun. Alan said that he grabbed Jake and pinned him against the wall, then wrestled with him on the porch. Julie knocked them off the porch as she attempted to retrieve the gun, he said. He said that Julie and Sylvia and his father ended up inside the house, then Yeomans came outside and pulled Jake into the house. Alan went outside and broke a car window to get Lee Ann out of the locked car. Alan said that he took Lee Ann to a back room of the house, and took the rifle and threw it into a bedroom so that it would not be used. He said he knew ‘they were all in there fighting.’ (R. 654.) Alan said he did not see Yeomans beat anyone, but he did see his father kick Sylvia in the head. She was on the floor moaning and had already been beaten in the head, Alan said. Later, Yeomans handed Julie’s purse to Alan and told Alan to take the children to the car. They left the scene in Julie’s car and drove to Florida. Alan testified that he did not *1045 remember telling the police, ‘He (Yeo-mans) just said that he was going out there to get the baby and we might have to take them out to do it.’ (R. 673.)
“Clint Yeomans testified that his biological father was Lewis Yeomans, but that James Yeomans had raised him and he considered James Yeomans to be his father. Clint said that Yeomans was a good father who tried to teach the children right from wrong.
“Wynton Melton testified for the defense. He stated that he was a retired school administrator and that he was familiar with Yeomans and his family. Melton testified that Yeomans had been in the special education curriculum in school. He stated that he had perceived that Yeomans’s home situation was volatile and abusive. Melton testified that Yeomans engaged in some verbal abuse in school but that he had not been physically violent. Yeomans quit school during the twelfth grade.
“Penny Drake, Yeomans’s older sister, testified about their abusive father and stated that Yeomans had attended special education classes.
‘Wayne Lewis Yeomans, the appellant’s brother, testified that he had lived next door to Yeomans and Julie for several years. He said that he had seen them fight but that they seemed to be getting along well during the weekend before Julie moved out.
“After the evidence was presented, the attorneys made their closing arguments and the judge charged the jury. The jury found Yeomans guilty of each of the capital murder charges.
“At the sentencing hearing before the jury, Yeomans presented the testimony of Donald Weeks, a jailer at the Geneva County jail, who stated that Yeomans had ‘given his' life over to the Lord.’ Weeks said that Yeomans had admitted that what he did was wrong and that he was ‘ready to answer for that.’ (R. 780.) He testified that he believed that Yeo-mans was sincere in his beliefs.
“Two ministers who had met with Yeomans during his incarceration on these charges testified that Yeomans knew that what he had done was wrong and that he had expressed remorse for his actions. The ministers testified that Yeomans could share his religious knowledge with other inmates if he received a sentence of life imprisonment without parole.”
898 So.2d at 887-88. Thus, the record from' Yeomans’s trial demonstrates that trial counsel presented evidence similar to the evidence Yeomans alleges would have been discovered had counsel’s assistance been effective. See Daniel, 86 So.3d at 430 (recognizing that counsel is not ineffective for failing to present cumulative evidence).
Finally, included in the assertions Yeomans makes in support of this claim, he cites paragraphs 98-99 of his amended petition, in which he asserts that “in his opening statement at the sentencing hearing .... trial counsel stated incorrectly and prejudicially that ‘they have more aggravating circumstances than they do mitigating’ ” and that counsel “improperly suggested that the jury should weigh the mitigating and aggravating circumstances merely by adding up how many there were of each and comparing the totals.” (Yeomans’s brief, p. 72.) These allegations are refuted by the record.
The quoted portion of counsel’s statement is taken out of context; counsel actually stated:
“Now, in considering whether a person gets life or whether they are put to death, the law sets out some guidelines. One side is called' mitigating circum *1046 stances and the other side is called aggravating circumstances. I’m going to talk to you about them. This, is not all of them,,itls all that the law lists, but you can show any mitigating circumstances that would show some mitigation in whether or not he should receive life without parole versus being put to death. ., ' ,
“You should. consider, and the-law provides for this, that the Defendant has not significant history of prior criminal activity.. .That’s one of them.
“The second is that the capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. You heard the testimony, there is no question about him being under a severe and extreme emotional disturbance about his child. The Defendant acted under extreme duress or under the substantial domination of another person. Now, ordinarily that would mean that somebody got him to do it, but he was actually under the domination of Julie who had his child, and he went to get it and couldn’t get it and you know what happened.
“Then there is the capacity of the Defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was substantially impaired. There is no question that it was impaired. He suffers from an extremely low ÍQ. His’emotional balance had flipped and he had gone after something that he thought was being taken away from him. And as a result, the crime occurred.
■ “They; have more aggravating circumstances than they do mitigating, they list ten of them. And out of the ten, the only two that I can see that would be applicable with this crime would be the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. Then number nine, the Defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. That’s one of the aggravating circumstances.
“Now, if you just take the pure contributory circumstances, 'the mitigating circumstances versus the- aggravating circumstances, the mitigating is in his favor and that he could get life without parole, and that’s what he is asking for you to do today. To show you the different person that James is today, we have some witnesses that we will put on, and they are totally independent of any family members or anything else. Thank you.”
(Trial R. 775-77.) It is clear from the record that trial counsel’s statements about there being “more aggravating circumstances” and “they list ten of them” referred to the total number of aggravating circumstances the legislature has delineated, see § 13A-5-49, Ala.Code 1975 (listing 10 aggravating circumstances). Counsel told the jury that he thought only 2 of those 10 could apply to Yeomans’s case,' and he further stated that, in comparing “the mitigating circumstances versus the aggravating circumstances,” he thought the mitigating circumstances were “in [Yeomans’s] favor.” Thus, the circuit court properly dismissed this claim.
3.
Yeomans asserts that his appellate counsel — the same counsel who represented Yeomans at trial — -was ineffective on appeal for not arguing that his assistance during Yeomans’s trial was ineffective. Yeomans’s brief, p. 76.) In response, the State argues, in relevant part:
“Yeomans cannot cite to caselaw providing that appellate counsel is ineffective for failing to challenge his own perform- *1047 anee as trial counsel in the same ease. Furthermore, ... the State did not argue that Yeomans’s ineffective-trial-counsel claims were- procedurally barred under Rule 32.2(a)(3) or (a)(5) of the Alabama Rules of Criminal Procedure, so appellate counsel’s ■ decision did not prevent Yeomans from asserting those claims in postconviction review.”
(State’s brief, p. 52.)
The circuit court properly dismissed this claim.
4.
Yeomans argues that the circuit “court failed to consider Yeomans’s claim [of] ineffective assistance of counsel in its entirety.” (Yeomans’s brief, p. 78.)'
In Taylor v. State, 157 So.3d 131 (Ala.Crim.App.2010), we addressed a similar claim and stated:
“Taylor ... contends that the allegations offered in support of a claim of ineffective assistance of counsel must be considered cumulatively, and he cites Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, this Court has noted: ‘Other states and federal courts are not in agreement as.to whether the “cumulative effect” analysis applies to Strickland claims’; this Court has also stated: We can find no case- where Alabama appellate , courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel.’ Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App. 2005) ...; see also McNabb v. State, 991 So.2d 313, 332 (Ala.Crim.App.2007); and Hunt v. State, 940 So.2d 1041, 1071 (Ala.Crim.App.2005). More to. the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analy- . sisi - A cumulative-effect[1] .analysis does not eliminate the pleading requirements established in Rule 32, Ala.. R.Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative---.effect analysis, is performed only on properly pleaded claims that are not summarily dismissed for pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor’s obligation to pléad each claim: of ineffective assistance of counsel in compliance with the’ directives' of Rule' 32.”
157 So.3d at 140. “[T]he claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories. Each subcategory is an independent claim that must be sufficiently pleaded.” Coral v. State, 900 So.2d 1274, 1284 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005).
When considering whether the claims of ineffective-assistance-of-eounsel were sufficiently pleaded, the circuit court correctly considered each claim individually.
II.
Yeomans alleges that the circuit court erred in summarily dismissing three constitutional. claims: “(1) that he was mentally retarded and therefore ineligible for .the death penalty, (2) that the State’s conduct violated Brady [v. Maryland, 373 U.S. 83 (1963),] and (3) that lethal injection is unconstitutional.” (Yeomans’s brief, p. 81.)
A.
Yeomans alleges that the circuit court erred in holding that his claim based on Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), was procedurally barred. We disagree. As noted above, Atkins was decided on June 20, 2002, after Yeomans’s conviction and *1048 sentence in 2001 but while his appeal was pending in this Court. On July 3, 2002, Yeomans filed an amended and substituted brief in which he argued that Atkins applied to his case. This Court reviewed the record and decided this issue on the merits.
In deciding the issue adversely to Yeo-mans, this Court reviewed the evidence in the record as outlined above and held:
“Considering all of the evidence in the record before us and applying the broad definition of mental retardation set forth by the Alabama Supreme Court in Ex parte Perkins, supra, we are convinced that Yeomans is not mentally retarded. Therefore, Atkins v. Virginia, supra, does not preclude imposition of the death sentence in this case. See also, Ex parte Smith, [Ms. 1010267, March 14, 2003] — So.2d - (Ala.2003); Adams v. State, 955 So.2d 1037 (Ala.qCrim.App.2003). Yeomans is not entitled to any relief on this claim.”
898 So.2d at 902.
Because this issue was raised on direct appeal and addressed on its merits, the circuit court properly applied the procedural bar in Rule 32.2(a)(4), Ala. R.Crim. P.
B.
Yeomans asserts that the circuit court erroneously held that his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim was procedurally barred because it “was not raised at trial or on appeal.” Yeomans’s petition alleged:
“150. Mr. Yeomans was with his adult son, Allen [sic], and other children and stepchildren from the time of the killings until the time of his arrest. We believe the evidence will show that when the children were taken into police custody, the police took all of their clothes as evidence. These clothes were never returned to their owners, and neither the clothes nor the results of any tests run on the clothes were ever disclosed by the State. Although it is impossible to know what exactly those clothes and tests will show until discovery is granted and the evidence relinquished, they may demonstrate that Allen [sic] was in the room with Jim when the killings occurred, or that Mr. Yeomans and Allen [sic] were themselves injured in that confrontation.
“It can be assumed that the evidence serves to exonerate Mr. Yeomans, as this evidence was never presented at trial, nor were the results of any such tests provided to defense counsel.
“Once fully disclosed, such evidence is likely to be revealed as favorable to Mr. Yeomans in that it may decrease his culpability by suggesting that the killings may have been in self-defense or defense of another or that they may have been committed by another person at the scene.”
(C. 358-59.)
In McWhorter v. State, 142 So.3d 1195 (Ala.Crim.App.2011), this Court stated:
“A postconviction Brady [v. Maryland, 373 U.S. 83 (1963),] claim raised in a Rule 32 petition must meet all five prerequisites of ‘newly discovered evidence’ in Rule 32.1(e), Ala.R.Crim. P. Payne v. State, 791 So.2d 383, 398 (Ala.Crim.App.1999). Numerous recent opinions of this Court have held that a petitioner’s Rule 32 Brady claim is procedurally barred if the petitioner fails to plead that his claim is based on newly discovered evidence and could not have been raised at trial or on direct appeal. See, e.g., Bryant v. State, [181] So.3d [1087] (Ala.Crim.App.2011); Ray [v. State, 80 So.3d 965 (Ala.Crim.App.2011)]; Davis [v. State, 44 So.3d 1118 (Ala.Crim.App.2009) ]; Windsor [v. *1049 State, 89 So.3d 805 (Ala.Crim.App.2009) ]; Beckworth [v. State, 190 So.3d 527 (Ala.Crim.App.2009) ]; Smith v. State, 71 So.3d 12 (Ala.Crim.App.2008); Ferguson v. State, 13 So.3d 418, 444-45 (Ala.Crim.App.2008).
[[Image here]]
“McWhorter cites Ex parte Pierce, 851 So.2d 606 (Ala.2000), and McGahee v. State, 885 So.2d 191 (Ala.Crim.App.2003), for the proposition that the newly-discovered-evidence standard of Rule 32.1(e) does not apply to Rule 32 claims based on alleged violations of the defendant’s constitutional rights. McWhorter’s argument is misplaced because his Brady claim is procedurally barred. In Pierce, the Alabama Supreme Court held that Rule 32.1(e) did not apply to a juror-misconduct claim because the petitioner’s claim was a constitutional claim under Rule 32.1(a). The Court, however, went on to state that ‘[although Rule 32.1(e) does not preclude Pierce’s claim, Rule 32.2(a)(3) and (5) would preclude Pierce’s claim if it could have been raised at trial or on appeal.’ Pierce, 851 So.2d at 614. The Court stated that Pierce’s claim was barred under Rule 32.2(a)(3) and 32.2(a)(5) unless ‘he established that the information [forming the basis of his claim] was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal.’ Pierce, 851 So.2d at 616. Thus, although McWhorter does not have to prove that his Brady claim is based on ‘newly discovered material facts’ as defined under Rule 32.1(e)(l)-(5), he must still plead facts indicating that his claim could not have been raised at trial or on direct appeal to avoid being procedurally barred under Rule 32.2(a)(3) and 32.3(a)(5). This requires McWhorter to plead that the State’s alleged concealment of Rice’s statement ‘was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal.’ Pierce, 851 So.2d at 616. See also Hunt [v. State, 940 So.2d 1041 (Ala.Crim.App.2005) ], Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003), and Windsor v. State, 89 So.3d 805 (Ala.Crim.App.2009).”
142 So.3d at 1259-61. See also Madison v. State, 999 So.2d 561 (Ala.Crim.App.2006); Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006); Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005); Barbour v. State, 903 So.2d 858 (Ala.Crim.App.2004) (recognizing that Brady claims are subject to the procedural bars in a postconviction ■ proceeding).
The circuit court properly dismissed this claim. Although Yeomans generally alleged that he was “not aware of any suppressed evidence” (C. 359), he is required “to plead that the State’s alleged concealment of’ the fact that it had the children’s clothes and possibly tested them “ “was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal.’” McWhorter, 142 So.3d at 1261 (quoting Pierce, 851 So.2d at 616). Yeomans was aware of the fact that his son, Alan, was present with him when the murders were committed and therefore would have known whether Alan was in the room when the killings occurred — and therefore would have known to request physical evidence — such as the clothes Alan was wearing at the time — that might corroborate that. Yeomans also knew that Alan was taken into police custody; yet, nothing indicates that Yeomans ever requested access to any conversations between law enforcement and Alan. Yeomans also would have known whether he acted in self-defense or in defense of another, as *1050 well as whether he was injured in a confrontation with the victims. Even if-Yeo-mans could not have known these facts, however, he has not pleaded facts explaining what has changed since his trial or appeal that now makes him aware that the claimed exculpatory evidence exists. Consequently, Yeomans has not pleaded facts demonstrating that he is entitled to relief.
C.
Yeomans alleges that the circuit court erred in dismissing, as procedurally barred, his challenge to the constitutionality of Alabama’s method of execution — lethal injection.
Effective July 1, 2002, Alabama adopted lethal injection as its method of execution. Yeomans’s appeal did not become final until February 28, 2005, yet Yeomans did not attempt to challenge the constitutionality of lethal injection.[10] Thus, Yeomans could have raised this claim on appeal but did not do so.
Moreover, in Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court, relying on the United States Supreme Court’s decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), held that Alabama’s method of performing lethal injection was constitutional.' The Court stated:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Bees, 553 U.S. 35, 62,] 128 S.Ct. [1520,] 1538[, 170 L.Ed.2d 420 (2008)], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may .go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, wé conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendmeint to the United States Constitution.”
11 So.3d at 339.
Thus, the claim was properly dismissed.
III.
Yeomans’s petition alleges a claim of juror misconduct; specifically, the petition asserts:
“Juror L.J. did not disclose material information on voir dire. Trial counsel asked if any juror or their family had been a victim of a crime. Juror L.J. did not respond. However, this juror’s sis *1051 ter hád been a victim of a violent burglary and attempted rape. Juror L.J., therefore, deceived .the court about a matter that qualifies -as a valid basis for challenging her impartiality. This claim could not have been raised on appeal because juror L.J. hid this information from discovery during .voir dire. Only when new counsel was appointed, after the appeal had been completed, did Juror LJ.’s inaccurate responses at voir dire come to light.”
(C. 351.) In denying this claim as being “without merit,” the. circuit court cited an affidavit from Juror L.J., in which L.J. stated that her sister had been the victim of a burglary and an attempted rape but that L.J. did not learn of those facts until January 2006, almost five years after Yeo-mans’s trial. The State submitted this affidavit as an attachment to its April 1, 2010, motion to dismiss the amended Rule 32 petition. In his response to the April Í, 2010, motion to dismiss, Yeomans argued that “[attaching ... an affidavit in an attempt to .refute the well-plead[ed] facts in [the] Petition is inappropriate in a motion to dismiss,” and he contended that he was entitled to a hearing on the claim.
As to this claim, Yeomans has alleged facts that, if true, would entitle him to relief. See generally Ex parte Burgess, 21 So.3d 746 (Ala.2008). Although Rule 32.9(a), Ala. R.Crim. P., permits the circuit court “in its discretion ... [to] take evidence by affidavits, written interrogatories, or depositions, in lieu of an evidentia-ry hearing,” the circuit court in this ease gave no notice to Yeomans that it intended to take evidence by affidavit in lieu of an evidentiary hearing. Thus, Yeomans was not afforded an opportunity to offer evidence, in the form of an affidavit or otherwise, to counter the affidavit the State offered to disprove Yeomans’s claim. Accordingly, this case must be remanded for the circuit court to comply with Rule 32.9(a), Ala. R.Crim. P., and either hold an evidentiary hearing on the juror-misconduct claim or, after giving notice to the parties of its intention to do so, take evidence by one of the alternative means listed in Rule 32.9(a).
IV.
Yeomans contends that “the circuit court’s order violates due process by summarily dismissing a facially meritorious Rule 32 petition' without discovery_” (Yeomans’s brief, p. 24.) Our opinion-today affirms the summary dismissal of all claims on which Yeomans sought discovery; therefore, Yeomans did not show “good cause” to be entitled to discovery on those claims. See Ex parte Land, 775 So.2d 847, 853 (Ala.2000) (“[W]e must determine whether [the petitioner] presented the trial court with good cause .for ordering the requested discovery. To do that, we must examine [the petitioner’s] basis for the relief requested in his postconviction petition and determine whether his claims are facially meritorious. Only after making that examination and determination can we determine whether [the petitioner] has shown good cause.”), overruled on other grounds, State v. Martin, 69 So.3d 94 (Ala.2011).
It does not appear that Yeomans specifically sought discovery related to the' juror-misconduct claim. However, on remand, the circuit court shall afford Yeomans the opportunity to prove his claim as provided in Rule 32.9, Ala. R.Crim. P.,- which may include the . opportunity .to demonstrate that he is entitled- to discovery on that claim. Cf. Jackson v. State, 133 So.3d 420, 432 (Ala.Crim.App.2009) (“Therefore, if the circuit court determines that Jackson’s juror-misconduct claims are not procedurally barred, it should afford Jackson an opportunity to prove his claim as provided in Rule 32.9, Ala. R.Crim. P.”).

*1052
Conclusion

We affirm the circuit court’s dismissal of all claims in Yeomans’s petition except for the juror-misconduct claim involving L.J.; we remand this matter for the circuit court to consider the juror-misconduct claim in accordance with the instructions in the opinion. The circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 90 days of the release of this opinion. The materials on return to remand shall include the circuit court’s written findings and a transcript of the hearing, if one is conducted.
AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.
WELCH, KELLUM, and BURKE, JJ., concur.
WINDOM, P.J., concurs in part and dissents in part, with opinion.

. The facts of the crime 'are set forth extensively in this Court’s opinion on direct appeal. Yeomans, 898 So.2d at 882-88. In sum, Yeo-mans killed his victims by brutally beáting them with a metal pipe and shooting them. In describing the crime scene a,nd the injuries the victims suffered, this Court stated, in relevant part:
“[Alabama Bureau of. Investigation] Agent [Tommy] Merritt testified that Jake and Sylvia Simmons and Julie Yeomans had obvious wounds to their heads and that they had bled profusely from the wounds, He testified that each victim appeared to have been shot. A dead dog was also discovered near the victims. Like the human victims, the dog was lying in a pool of blood. A videotape of the crime scene was played for the jury.”
898 So.2d at 885.

. Section 13A-5-47(d) provides:
"Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, thé trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating'circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section I3A-5-52; The trial court shall also 'enter written findings of facts summarizing the crime- and the defendant's participation in it.”

.Yeomans contends that "[t]he circuit court improperly conflated the Rule 32 pleading burden with the burden of proof necessary to prevail on the merits.” (Yeomans’s brief, p. 18.) He .argues that language in the circuit court’s order dismissing the petition — such as references to "find[ings],” “testimony,” "showing[s],” and the weighing of “evidence” — "plainly establish that the court improperly weighed the evidence at the pleading state.” (Yeomans’s brief, p. 22.) As our opinion holds, the circuit court appropriately dismissed all but one of Yeomans’s claims.

. This general rule is subject to exceptions not applicable here. See, e.g., Ex parte Clemons, 55 So.3d 348 (Ala.2007).

. The circuit court relied on an affidavit submitted by the State to dismiss Yeomans’s claim alleging juror misconduct. We address this claim in Part III.

. As noted above, Yeomans specifically asserts that additional investigation with his adult son, Alan, would have led to the discovery that the “so-called stolen 'purse’ ... was actually a diaper bag belonging to Yeomans.” The record indicates, however, that in addition to Yeomans’s counsel having had funds provided to obtain the assistance of an investigator, witnesses were questioned extensively at trial about the “purse" and its contents. In view of those facts, Yeomans's failure to allege why additional expert testimony was “absolutely necessary” to discover this basic fact renders the claim insufficiently pleaded under Boyd.

. Yeomans notes that he raised the claim that counsel was ineffective for not arguing that the bag was marital property "as a standalone claim of ineffectiveness, and the appeal of the court’s dismissal of this claim is incorporated here.” (Yeomans’s brief, p. 50 n. 3 (citing paragraphs 82-85 of the Petition, C. 330-31).)

. . Atkins was decided on June 20, 2002, after Yeomans's conviction and sentence but while his appeal was pending in this Court. On July 3, 2002, Yeomans filed an amended and substituted brief in which he argued that Atkins applied to his case. Later in this opinion, we separately address his postconviction claim based on Atkins.

. Jackson’s petition alleged, in pertinent part, the following:
" 'Trial counsel also failed to obtain and present independent expert witnesses at the sentencing phase of Mr. Jackson's trial. These experts would have reviewed medical, social services, school,, mental health, and other institutional records; interviewed Mr. Jackson and members of his family; developed .a family history assessment; expressed an opinion as to the connection between Mr. Jackson’s childhood and the behavior for which he was convicted; assisted counsel in understanding and presenting evidence of the effect of Mr. Jackson's background on this behavior; and testified about his or her findings and conclusions regarding Mr, Jackson’s background, family history, mental health, and history of alcohol and drug abuse.' ”
Jaclcson, 133 So.3d at 451.

. As noted above, Yeomans filed an amended brief on July 3, 2002, to raise an Atkins claim.

. The State did not cali any witnesses at the hearing.'